UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

- - - - - - -

UNITED STATES OF AMERICA,

        Plaintiff,                                 Case No. 2:23-CR-7-RJJ

vs.                                               Hon. Robert J. Jonker
                                                    United States District Judge

NATHAN WEEDEN,

        Defendant.

_____/

**DEFENDANT NATHAN WEEDEN'S BRIEF IN SUPPORT
OF MOTION FOR DOWNWARD VARIANCE**

On June 4, 2024, this Court will sentence Nathan Weeden, who was convicted earlier this year of conspiracy against rights and damaging religious property following a multi-day jury trial. (R. 74, Presentence Investigation Report (PSR), PageID. 371.) United States Probation calculated Nathan's advisory guidelines range to be 24 to 30 months' incarceration based on a total offense level of 17 and a criminal history category of I. (*Id.*, PageID. 383, ¶ 78.) While Nathan understands that by exercising his right to trial in this case (for reasons set forth herein), he does not and should not receive a reduction of his base offense level for acceptance of responsibility. However, contrary to the government's assertions, Nathan *has* taken responsibility for his conduct, and he is prepared to address the Court regarding how he has grown, the ways he regrets the impact of his actions, and his hope for the future.

Nathan has no legal objections to the calculation of his sentencing guidelines. Still, Nathan respectfully asks the Court to consider, among other factors, his lack of any criminal history, his age at the time of the offenses, the length of time between the offense conduct and his prosecution, and his personal and professional growth. He asks the Court to vary downwardly and impose a sentence equivalent to time already served since his conviction and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

Law enforcement began investigating Nathan and others following the September 21, 2019, discovery of swastikas and hastily-drawn "runes" spraypainted on the outside of Temple Jacob, a Jewish synagogue in Hancock, Michigan. The local law enforcement investigation into the vandalism intersected with an FBI investigation into a neo-Nazi extremist group known as "The Base." During its investigation, the FBI utilized information gleaned from an undercover agent ("UC") who had infiltrated the organization. The UC became an active and practicing member of The Base ("TB") and, once vetted, was privy to group chats on a forum known as "The Wire," where one of the group participants went by the moniker "Kolchak."

Kolchak, a member of the "Midwest Cell" of TB, was known by other members to reside somewhere in the Upper Peninsula of Michigan and possibly attend Michigan Technical University (MTU), located in Houghton, Michigan, a neighboring town of Hancock. During the spring and summer of 2019, MTU and Houghton Police Department had "responded to a series of 'stickering' incidents around town and on campus." (R.74, PSR, PageID 374, ¶ 11.) The stickers displayed QR codes linking viewers to a recruiting

2

video for TB. (*Id.*) Law enforcement began to suspect that the earlier stickering incidents were related to the September vandalism of Temple Jacob.

In the months that followed, certain TB members were publicly identified and "outed" and the dialogue on TB encrypted chats escalated, with TB member Richard Tobin calling all cells to participate in what he deemed "Operation Kristallnacht"—a reference to a wave of violence that occurred against Jewish-owned businesses in 1938, also known as the "Night of Broken Glass." Tobin, in his call to action, asked members to "slash the tires, leave the symbol of our revolution wherever you go, and burn what you please…" (R. 74, PSR, PageID. 357, ¶ 14.) This "operation" was meant to take place from September 20, 2019, through the end of the month. TB leader Rinaldo Nazzaro wrote, "Don't forget spray paint." (*Id.*, ¶ 15.) In response, Yousef Barasneh, who was later arrested and charged as part of this conspiracy, spray-painted anti-Semitic symbols and language on the building of Beth Israel Sinai, a synagogue in Racine, Wisconsin on September 20, 2019.[2] The following night, Kolchak also answered Tobin's call and defaced Temple Jacob.

The FBI's investigation ultimately led it to Nathan, and in fall of 2020 agents confronted him personally on the MTU campus. Still a college student and only 20 years old, Nathan did not directly deny that he was Kolchak, or that he was involved in the vandalism of Temple Jacob, and the investigation ostensibly continued.

Nearly three years later, in June 2023, a Grand Jury in the Western District of Michigan returned an indictment charging Nathan with conspiracy against rights and

---

[2] PSR, PageID.375 ¶ 16 and 17 incorrectly references dates in 2020.

3

damaging religious property. On July 26, 2023, law enforcement arrested Nathan – who by that time was 23 years old, married, employed full-time as an engineer, and, significantly, completely detached from TB – at his mother's home. Faced with Federal indictment and a plea offer from the government which required a felony conviction that Nathan knew would forever alter the course of his life, Nathan exercised his right to trial and was convicted. Barasneh cooperated and testified against him at trial. In an abundance of caution, this Court remanded Nathan to U.S. Marshals custody on the date the verdict was handed down but made clear it would consider a motion for bond pending sentencing if an appropriate record was built. Nathan demurred, opting to begin serving his sentence and repaying his debt. He has remained in continuous custody since the end of trial.

## ARGUMENT

The journey that has brought Nathan before this Court is a long and complicated one, and has required him to reckon with a past – and an identity – he would have preferred to forget. But as the government surrounded and encircled him as he finished his education at MTU, he realized that his hateful past had caught up with him, and there was nowhere to hide. Indeed, Nathan was not ready to reckon publicly with his past when, as a junior in college, he was interrogated by FBI agents on his campus. He came closer a year later when he wrote to those same agents and attempted to dialogue with them, but fear of destroying a future he was working hard to build – by admitting to a past he longed to forget – kept him from coming forward and disclosing that past.

4

The experiences of being investigated, indicted, prosecuted, tried and abruptly taken into custody have had the effect government officials presumably intended them to have, but the seeds of change had been planted long ago. Simply put, Nathan is no longer "Kolchak," the masked and shadowy figure who spouted hateful comments online, marketed a racist organization on his college campus, and ultimately directed real spray paint at a real house of worship in response to a vile "call to action." But there is no disputing that in 2019, Nathan *was* Kolchak, and he knows that the time has come for him to acknowledge that reality to this Court, to the government, to his family, and most of all, to the people he hurt with his hateful acts and words.

As the Court is aware, when sentencing a defendant who has been found guilty of a crime, this Court must comply with the basic aims of sentencing set forth in 18 U.S.C. § 3553(a). *Rita v. United States*, 551 U.S. 338, 348 (2007). The Court should "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing. 18 U.S.C. § 3553(a); *Kimbrough v. United States*, 522 U.S. 85, 101 (2007). While courts must continue to consider the sentencing guidelines, they are no longer mandatory, and courts are only required to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. § 3553(a). Those factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar

5

>> conduct; and (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7) (cleaned up).

In determining the "need for the sentence imposed" under the second factor, the Court should craft a sentence "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," "to protect the public from further crimes of the defendant," and "to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A)-(D); *see Kimbrough*, 552 U.S. at 101. In *United States v. Ferguson,* 456 F.3d 660, 665 (6th Cir. 2006), the Sixth Circuit held that, after *United States v. Booker*, 543 U.S. 220 (2005), a judge must impose the lowest sentence that is minimally sufficient to meet those goals, whether that sentence consists of probation, time served, a mandatory minimum sentence, the statutory maximum sentence, or somewhere in between.

In this case, several of the factors are particularly relevant. First, with regard to the first factor, Nathan has demonstrated that—while he had what he now calls a terrible lapse in judgment five years ago—he has otherwise been a responsible citizen. He has no criminal history or history of substance abuse. As both the PSR and the many letters from family and friends reflect, Nathan has never used illicit substances and has never engaged in drinking to excess. He is highly intelligent, earning his bachelor's degree in engineering and securing gainful employment in the same field until the day he was remanded. Accordingly, Nathan "does not present many of the typical rehabilitation needs exhibited by defendants who come before this Court." (R. 74, PSR, PageID. 388.)

6

Critically, and contrary to the government's contentions, the rehabilitation of Nathan Weeden is well underway, and has been for many years. As Nathan intends to tell this Court, in person, he recognizes the seriousness of his crimes. He has come to see how immoral, hateful, and malicious men like the members of the Base were, and he deeply regrets his association with them and the acts he committed to further their goals. Importantly, as described further below, he has grown beyond this time in his life.

Next, the second, third, and seventh factors are relevant: the need for the sentence imposed, the kinds of sentences available, and the possibility of restitution. In this case, a sentence that recognizes and incorporates time already served and augments it with supervision will punish Nathan for his crimes but also allow him the ability to make restitution in this case. The Sixth Circuit has recognized the ability to make restitution payments as a reason for downward variance. *United States v. Musgrave*, 647 F. App'x 529, 536, 339 (6th Cir. 2016); see also *United States v. Cole,* 765 F.3d 884, 886-87 (8th Cir. 2014). As the court stated in *Musgrave,* "…the goal of obtaining restitution for the victims is best served by a non-incarcerated and employed defendant." *Id*. at 536 (citing to the record). The court went on to say, "This does not mean that the employment or socio-economic status of the Defendant is the basis for the Court's ultimate sentence. It is merely an observation of the facts of this particular case in light of the Court's statutory requirement to consider the need to provide restitution to any victim of the offense when imposing a sentence." *Id*.

Here, a variance would allow Nathan to repay the government and Temple Jacob. "Although he has limited assets at this time, he is an intelligent college-educated

7

individual with significant earning potential; thus, he would have the ability to satisfy a fine within the guideline range through monthly payments over the course of a supervised period." (R. 74, PSR, PageID. 383, ¶ 76.)

A sentence of limited additional custody also reflects the "need for the sentence imposed." Five years have passed since Nathan engaged in this conduct, and as such it is difficult to point to any deterrent effect further custody would have. Nathan was an angry and disaffected *teenager* when Operation Kristallnacht was carried out; he is now in his mid-twenties and married with meaningful work experience and a well-established community of friends and family. Nathan has faced his past mistakes, has grown personally to see the evil and malicious intent of TB, and is actively engaged in improving himself through involvement in church and his professional responsibilities. A non-custodial sentence—with the requirement of full restitution—will make Temple Jacob financially whole, while allowing Nathan to continue his growth as a more productive member of society.

Finally, the sixth factor weighs in favor of a downward variance: "the need to avoid unwarranted sentencing disparities." 18 U.S.C. § 3553(a)(6). Another member of TB, Barasneh, pled guilty to one count of violating 18 U.S.C. § 241. (R. 106, Case 2:20-cr-00026-PP, E.D. Wis.) The complaint and subsequent indictment in that case indicate that Barasneh, as a member of TB, "conspired with others to vandalize property associated with Jewish citizens." (R. 1, Case 2:20-cr-00026-PP, E.D. Wis.) "On September 22, 2016," the complaint alleges, "law enforcement officers in Wisconsin discovered that the Beth Israeli Sinai Congregation . . . had been vandalized . . . and anti-Semitic words spray-

8

painted on the exterior of the building." (*Id*.) Barasneh, who later testified against Nathan, was sentenced to two years of probation. (R. 106, Case 2:20-cr-00026-PP, E.D. Wis.) While it appears that Barasneh pled guilty instead of exercising his right to trial, his crimes (which, incidentally, were prosecuted a few short months after Operation Kristallnacht took place) were nearly identical to Nathan's and, in fact, were part of the same conspiracy. Given the similarity in conduct, Nathan's sentence should not be dissimilar to Barasneh's, and certainly not one above the advisory guidelines as the government appears to favor.

There is no question that the nature and circumstances of the offense – conspiracy against rights – are incredibly serious. In asking for a variance, Nathan in no way intends to minimize the seriousness of the crimes he committed. Rather he asks the Court to consider the dichotomy of Nathan Weeden as a teenager and the Nathan Weeden that will stand before the Court to be sentenced. This theme is also echoed in the numerous letters of support submitted on Nathan's behalf. Mr. Royer speculates in his letter that "[Nathan] did feel somewhat estranged [from his family] . . . I think Nathan was looking for a home, for acceptance, for some place to feel valued." (Ex. B, Dan Letter). Nathan's mother, Josephine, confirmed this observation, saying that as a teenager who was very different from his peers and family members, Nathan "was searching for acceptance and belonging away from home and sadly he found it with extremist groups." (Ex. A, Josephine Letter).

Since the evening of September 19, 2019, Nathan has made considerable efforts to change the course of his life. In a way, he declared his own call to action, one that would

9

distance him from the hateful and malicious members of the group, and instead align him with people of virtue, honor, and faith. Nathan began attending church regularly in college and, as this Court knows from observing trial testimony, converted to Catholicism as a young man. His faith has deepened since then, and he is incredibly proud of his decision to join the Catholic Church as a younger man.

Those who know him in the faith context speak highly of him, and do so being aware of the sins of Nathan's past. Samuel Ora, the Director of Faith Formation at a Catholic parish in Michigan, says, "I believe that Nathan was drawn in the dark directions before his conversion, but I now, after many opportunities of observing him, believe him to be a morally upstanding person…I am convinced that Nathan has truly reversed the bad direction of his youth and is now seeking to build up his family and friends in obedience of Christ's teaching." (Ex. G, Samuel Letter.)

In 2022, Nathan graduated from MTU and married Shaina Royer, his girlfriend of three years, whom he met through his parish in Houghton. While Shaina continued her studies at MTU, Nathan moved back to southeast Michigan following graduation and began living with his mother to save money on rent. He began working as a gas engineer with KLE Inc., where he remained gainfully employed until he was remanded following his conviction in January 2024. Nathan's former co-worker, Drew Disbrow, who met Nathan in 2023, recently became aware of Nathan's actions and submitted a letter in support, speaking about the man he knows Nathan Weeden to be now. "[Nathan] was never exclusive to this welcoming attitude with regards to anyones [sic] ethnicity or creed…I would consider us close friends…I never heard Nathan say anything bad about

10

a person due to their ethnicity or creed." (Ex. F, Drew Letter). Nathan's stepmother, Justine Weeden, who met Nathan in 2022, mirrors Drew's observations in her letter to the Court. "I have never known or seen Nathan to show any kind of malice or even talk unkindly about anyone or anything."(Ex. D, Justine Letter).

Over the past five years, Nathan's commitment to the church has remained unchanging. Following his move to Saline, his mother says, "[H]e began attending church regularly and had found a community that he was truly enjoying being a part of . . . [he] took up baking and weekly shared his goods with the church community." (Ex. A.) He is also a caring grandson to his grandparents, she says. (*Id*.) Likewise, Justine notes that, even though she is Nathan's stepmother, Nathan would bring home those baked goods to share with her boys, and that he always showed her family kindness. (Ex. D.)

Nathan's father, Andrew, writes, "The Nathan that committed the crimes of Sept 2019 is not the young man that stands before us today." (Ex. C, Andrew Letter.) Likewise, his grandparents note that Nathan "has matured into an upstanding citizen and contributes taxes and diligence to his community." (Ex. E, Clark Letter.) And, finally, Nathan's director of faith formation writes, "He is unfailingly courteous and temperate, and he has proved a friend worthy of trust." (Ex. G.) With the help and guidance from his family, friends, and priest, Nathan hopes to demonstrate that he is committed to continuing the new life-trajectory that began after his separation from TB.

## CONCLUSION

Nathan would like to close with a statement from Dan Royer, his father-in-law:

> Like many young men whose parts of the brain involving judgment are not yet fully developed, he did something momentously stupid. It is now nearly 5 years later. His judgment is maturing as he ages. He still has a way to go, but what 24 year old doesn't?

Nathan respectfully requests that this Court vary from the advisory guidelines range and sentence him to time served with a term of supervised release. This sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing enunciated by Congress in 18 U.S.C. § 3553(a).

                                           Respectfully submitted,

Dated: May 21, 2024                    */s/ Heath M. Lynch*
                                        HEATH M. LYNCH
                                        SBBL Law, PLLC
                                        60 Monroe Center St NW, #500
                                        Grand Rapids, MI 49503
                                        heath@sbbllaw.com
                                        (616) 458-5500

EXHIBIT A

Dear Judge Jonker,                                                                                            May 2024

This is the letter that no mother ever envisions she will need to write. I am Nathan Weeden's mother.  It goes without saying that I hope you will show compassion when considering my son's sentencing.

Nathan has been a challenging child. He had difficulty fitting in with his peers through grade school and high school.   He is very intelligent but couldn't find the proper outlets to use his intelligence. He was not involved in organized sports and didn't find a group to help him navigate his teenage years.   I am sure Nathan would attest that he grew up in an environment that was difficult for him to manage.   He is the second of my four children, and his sisters are extremely different from him.  To make matters worse for Nathan, his father and I went through a very contentious divorce in 2019.  That family dynamic was the backdrop to Nathan's final year in high school and beginning of college. During this tumultuous time Nathan was searching for acceptance and belonging away from home and sadly he found it with extremist groups.

I do, however, feel that Nathan has moved forward and matured since that time.  In 2022 he graduated from Michigan Tech with a mechanical engineering degree.  In that same year, he married his college girlfriend who decided to continue her education and pursue a master's degree at Michigan Tech University.  Nathan then moved into my home as he had the opportunity to get a full time engineering job in Lower Michigan and obviously could save money on rent while living with me while his wife continued her studies.

During the year that Nathan lived with me he attended church regularly and had found a community that he was truly enjoying being a part of.  He was working in person and later was allowed to work remotely, giving him better flexibility to go to the UP to see his wife.  Nathan took up baking and weekly shared his goods with the church community and those at his office as well.  He would try to see my parents every week and would call them and follow up on their well-being regularly.  He was and still tries to be a very attentive and caring grandson to them.

Nathan's future rests partly in your hands.  In order for him to move forward and learn from his mistakes I feel that he needs more guidance and less punishment.  Of course, as his parent, I would ask that you consider his future and how his sentencing will affect the rest of his life.  The sooner he is able to be back with his wife, who will be attending the University of California Davis for her PhD, the sooner he can begin to move forward in a new light.  I know that he is ready to proceed in a new direction with strong guidance from his parents, his in laws, his grandparents and his priest.

Nathan has no prior criminal record, and is not a drug user.  Nathan has made some poor choices and has already paid dearly for them.  I hope you can see the path forward that I envision for him, a path that takes him into a more caring and empathic future.  A path where he can continue to grow and develop as an individual and contribute positively to our community.

Thank you for your kind consideration,

*Josephine Weeden*

EXHIBIT B

May 5, 2024

Dear Judge Jonker:

I am Nathan Weeden's father-in-law.  I first met Nathan late summer or fall of 2019.  Through holiday get-togethers and seeing Nathan when my wife and I visited our daughter in Houghton I have come to know him moderately well through the years.  While some of what I am about to say is speculation, it is speculation based on a lifetime (I am 72) of observation of human behavior.

Early on Nathan complained about how he felt like he did not fit in with his family.  He had different interests, goals, and beliefs about how he wanted to live his life.  For example, his mother ran marathons while he hated running.  His family loved the city, but he preferred a rural lifestyle.  I am not arguing that his perception of his family was accurate but that he did feel somewhat estranged.  On top of that, there was the stress and turmoil he must have felt from his parents impending divorce.

Here is where the speculation comes in.  I think Nathan was looking for a home, for acceptance, for some place to feel valued.  Unfortunately, he found it in the wrong place, an online chat room.  He started to confuse the fantasy of the online world with the real world.  I say this because I think he pretty much immediately realized his mistake as he told our daughter soon after that he had done something really stupid.  He never told us what it was he had done but through news reports we made our guesses.

None of this is to excuse in any way what he did, it is the first step to gross evil by the ethics of our family, but to put some context around it.

Like many young men whose parts of the brain involving judgment are not yet fully developed, he did something monumentally stupid.  It is now nearly 5 years later.  His judgment is maturing as he ages.  He still has a way to go, but what 24 year old doesn't?  I seriously doubt that today he would even consider, let alone do, what he was convicted of.  His encounter with the legal system has already made him "scared straight".

In everyday life, when dealing with real flesh and blood people, I have never seen him act with other than respect and kindness, no matter their race or creed.  His circle of friends proves that. He can be careless or thoughtless, yes, but I have never witnessed him acting maliciously toward anyone.  He is never happier than when playing with children or pets.  He wants to put this mistake behind him as quickly as possible, which is why he never asked to be let out on bail between conviction and sentencing, so he can get on building a life with our daughter.

Continued incarceration beyond the legally required minimum would not serve the goals of our justice system.  The felony conviction has already harmed Nathan's professional career prospects and, thereby, his life's trajectory, punishing him more than any reasonable amount of additional prison time would.  He regrets what he did.  After his brush with the justice system, he now poses less risk to society than the average citizen does.  Each extra day in prison is a tax burden on our citizens.  Please sentence him to the minimum possible so he can begin renewing his life as a productive member of society.

Respectfully,

*Dan Royer*

Dan Royer

EXHIBIT C

317 E Michigan Ave

Saline, MI 48176

May 6, 2024

Dear Judge Jonker,

My name is Andrew Weeden, and I am a Nuclear Medicine Technologist in Ann Arbor MI. I am writing on behalf of my son, Nathan Weeden, to offer my opinions as character witness before you sentence him on June 4th.

The Nathan that committed the crimes of Sept 2019 is not the young man that stands before us today. When he met his current wife, Shaina, in 2020 I feel he made a conscious decision to change his life. I noticed a change in Nathan with regards to caring and empathy, and he became a much more engaging person. They were married in early 2022 and after Nathan's graduation, Dec 2022, he obtained a job in Wixom which utilized his Engineering Degree. Though forced to live apart, as Shaina finished her studies in Houghton, Nathan's primary concern was how he could be an upstanding religious man that provided for his wife.

My hope is for a lenient sentence so Nathan may continue this journey of improvement. He has the support of his wife, myself, his mother, his grandparents and parents in law.

Sincerely,

Andrew Weeden

aweeden@med.umich.edu

(734) 635 0416

EXHIBIT D

317 E. Michigan Ave
Saline, MI. 48176

Dear Judge Jonker, 5/9/2024

My name is Justine Weeden. I am writing this letter on behalf of my step-son Nathan Weeden.

I have been a life-long Michigan resident and work as a nurse in the Ann Arbor area. I currently live in Saline with my husband and three children. I have known Nathan Weeden since 2022 and can honestly say that he has always shown me and my family kindness and respect as well as going out of his way to help me with gardening, taking my boys to the movies and bringing us home-baked goods. Nathan has a very strong Christian faith which is something he and I bonded over. I have never known or seen Nathan to show any kind of malice or even talk unkindly about anyone or anything. I hope you take into consideration that the Nathan I know I believe is no longer the same person who is being charged with committing

these crimes back in 2019.

Sincerely,
Justine Weeden
*Justine Weeden*

(734) 306-9987
justineweeden@gmail.com

EXHIBIT E

Dear Judge Jonker,                                              05/08/2024

We are Jane & Bob Clark, the maternal grandparents of Nathan Weeden.   Nathan spent much of his vacation time with us.  When he was in college and working, he called us weekly to inquire about our many health issues.  Nathan has continued to call us weekly from prison.  We look forward to talking with him each week.  When he stayed with us he helped with chores around our home.

Since high school Nathan has matured greatly.  He has finished college and married a fellow engineer (2022) and held down a full time job as an engineer at a company outside of Detroit.

When we go out to restaurants he always helps me, his grandmother, from the car to the restaurant as I need a cane to navigate.

Nathan is a devote Catholic and attends mass whenever possible.  He collects and sells rare coins from all over the world.  Nathan has never used drugs.  He has matured into an upstanding citizen and contributes taxes and diligence to his community.  Nathan never participated in competitive sports, but he worked as a life guard during his high school summer vacations at the community recreation center.

He helps me (Grandmother)   use the computer and is very helpful with his grandfather around the house.  Nathan is an avid reader and is very intelligent.

We hope you will consider Nathan's growth and the changes he has made in the last several years when you consider his sentencing.

Sincerely,

*Jane H. Clark*
*Robert M Clark*

EXHIBIT F

Dear Judge Jonker,

Tuesday April 30 2024

I met Nathan Weeden in the spring of 2023 at a wedding. We hit it off and got lunch at applebees, exchanging contact info. We keep in touch in the following months, I would then be unemployed, he was the most enthusiastic of my friends to help me find a job. The company he was working for, "KLF Inc." was hiring and he sent me the job posting. It is where I currently work now. Nathan was eager to make me feel welcome at my new job, we would often take coffee breaks by the water cooler, and he was never exclusive to this welcoming attitude with regards to anyones ethnicity or creed. He would open up our conversation to anyone entering the breakroom. I would consider us close friends, we would tell each other anything. I never heard Nathan say anything bad about a person due to their ethnicity or creed. He is a light-hearted guy since I have known him. Outside of work, we have attended church events together like a picnic last June. All that is to humbly ask: please be lenient in the means which you administer justice. If you have any questions about Nathan's behavior in the workplace I will be happy to answer; please contact me, Drew Disbrow at 586-913-3469.

Sincerely,
Drew Disbrow
Drew Disbrow

# EXHIBIT G

Samuel Patrick Ora

3730 E Acacia Dr

Midland, MI 48642

989-600-5100

5/6/2024

Honorable Judge Robert Jonker

Western District of Michigan

Re: Nathan Weeden

Dear Judge Jonker,

My name is Samuel Ora. I have been a Director of Faith Formation at a Catholic parish in the state of Michigan during the last couple of years. I am writing on behalf of Nathan Weeden to request that he be given a lenient sentence.

I met Nathan in January of 2022 through a church I was attending near Houghton, Michigan as I was working as an intern at Michigan Technological University. Over the ensuing months, he became my friend, and he remained so after I had left that part of the state. I quickly had a high appreciation for Nathan's character, and I consider him one of the most honest and generous men I know. We have stayed in regular contact up to the present time. He is unfailingly courteous and temperate, and he has proved a friend worthy of trust.

In my estimation, Nathan has changed much in character since 2019, although I did not know him at that time in his life. We have had several conversations of a spiritual nature, and I was very edified in hearing him recount his conversion experience – an experience that necessitates a dramatic moral change in thinking and acting. I believe that Nathan was drawn in dark directions before this conversion, but I now, after many opportunities of observing him, believe him to be a morally upstanding person. Nathan possesses a wry and sardonic sense of humor which puts some people off, but those who know him well are plainly aware that he speaks and acts in good will towards others. I have never seen him wrong anybody, and I find it difficult to imagine. I am convinced that Nathan has truly reversed the bad direction of his youth and is now seeking to build up his family and friends in obedience to Christ's teaching. I believe that the negative report of his name after his arrest is ample punishment for a youth already repented of. His character has my support.

Respectfully,

Samuel Ora